HENSLEE v. WEST KENTUCKY COAL CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1917.)

No. 2928.

**1. Maritime Liens ☞37—Claims Against Vessels—Priority.**

H. let J. have $3,500 with which to purchase a steamer, and took from him an instrument reciting that this sum was due H. and was to be used solely for the purchase of the steamboat, and that H. was to own the steamboat until $1,500 was paid and a note for the balance given. A bill of sale was taken in J.'s name, to which H. made objection, and later, after H. had become anxious about the return of his money, J. gave him a bill of sale, which H. filed with the collector of customs, also filing a managing owner's oath, reciting that the steamboat was his property. H. insured the vessel in his own name as owner, made inquiries about the boat's liabilities, and told certain creditors that he was its owner, directing some of them to furnish it nothing except on his order. The boat burned, and he received the insurance money. *Held,* that H. was the owner of the boat from the time of its purchase, and his rights to the insurance money were subordinate to the claims of seamen for services and of parties furnishing supplies and materials.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 58–70.]

**2. Shipping ☞30½—Claims Against Vessels—Priority.**

A mortgage given by J. to H. on another steamer, reciting that it was to secure a debt for a cash loan of $3,500 secured by a bill of sale on the first steamer, was not necessarily inconsistent with H.'s ownership, as the amount named in a mortgage is not conclusive as to the indebtedness, and J. was morally liable to protect H. against loss.

**3. Admiralty ☞27—Libels in Personam.**

Under Act June 23, 1910, c. 373, § 4, 36 Stat. 605 (Comp. St. 1916, § 7786), providing, relative to liens on vessels, that nothing therein shall prevent a furnisher of repairs, supplies, or other necessaries from waiving his right to a lien, and Admiralty Rules 12 and 13 (29 Sup. Ct. xl), providing that, in suits for supplies or repairs and for mariner's services, the libelant may proceed against the ship, or against the master or owner in personam, where a ship burned, and the owner received the insurance money, persons having claims for services, supplies, and materials could proceed against him in personam.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 275–277.]

Appeal from the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Libel in personam by the West Kentucky Coal Company and others against T. J. Henslee. From a decree for libelants, the libelee appeals. Affirmed.

The appellant libelee, Henslee, seeks a reversal of the decree of the District Court, in which it was found that he was the owner of, and not merely the holder of a lien against, the steamer French, and that his rights to the insurance paid on account of the burning of such steamer are subordinate to the claims of seamen for services and of others who furnished supplies and materials for such vessel. Capt. Jacobs, being desirous of purchasing the French to ply on the Tennessee river, applied for funds to effect such purpose to Henslee, a retired physician engaged in farming, merchandising, and banking business, but unacquainted with boats and their navigation. Influenced somewhat by his son, a young man about 22 years old, Henslee furnished $3,500 on July 25, 1914, for which Jacobs gave him a certificate, drawn by the son, that "there is due T. J. Henslee the sum of $3,500 in cash, same to

be used solely for the purchase of a steamboat called French, it being agreed the said T. J. Henslee is to own said steamboat until cash to the amount of $1,500 has been paid, and note of approved security for balance of $2,000 has been rendered." Then and thereafter Jacobs owned no property except the steamer Alma, which was mortgaged, and a little home worth about $800 or $900. He purposed the immediate organization of a corporation to take over the boat and make the $1,500 payment. His expectation and efforts in that behalf failed of fulfillment, but were not abandoned prior to the boat's destruction. Whether there was a further agreement resting in parol, as Henslee claims, that the $1,500 should be repaid in 10 days and a secured note be given for $2,000, to mature in 6 months and bear interest at 10 per cent., is, in the view we take of the case, immaterial, and need not be determined. The $3,500 were delivered by Jacobs to one Berry, who, going to Parkersburg, W. Va., purchased the French for $3,600, taking a bill of sale for the same in Jacobs' name, to which Henslee, when he learned of it, made some objection. Berry also loaned Jacobs $400, to be applied toward the purchase price and the equipment necessary for taking the steamer to Paducah, Ky. Jacobs took possession of the boat at Louisville and thereafter retained possession of it until it burned. The bill of sale and an affidavit made by Jacobs to secure the enrollment of the vessel, which affidavit recites his sole ownership of it, were lodged by him in the office of the collector of customs at Paducah, Ky. Jacobs put the boat into service, employed all help, and ordered all supplies and repairs, and continued at all times so to do. Having no working capital, he was dependent on the boat's earnings for its operation. They were insufficient to meet the expenses necessarily incurred. On substantially every trip made by the boat a stop was made at the landing nearest the Henslee residence, on which occasions either the appellant or his son, or both of them, met the boat to ascertain whether it was meeting its obligations. Henslee stated that he did not wish it to become indebted. Some effort was made to learn what its books showed as to its financial standing. He also was anxious about the return of the $3,500 used in purchasing the boat, and it would seem that the point was reached at which he would have been willing to have accepted part payment of that sum and security for the balance, or sufficient security for the entire $3,500 even, if Jacobs had been able to make such payment or give such security. As no payments were made, on September 10th, at Henslee's request, Jacobs gave him a bill of sale for the French, which was filed with the collector of customs 12 days later. On September 12th, Henslee made a managing owner's oath, which recites that the French was wholly his property and that Jacobs was at that time its master. This instrument was also filed with the collector of customs on a date not shown by the record, but stated by counsel to be September 22d. On October 9th, at Henslee's instance, he was given a mortgage on the Alma, which was filed for record 20 days later. The mortgage recites that Jacobs is "justly indebted to T. J. Henslee in the sum of three thousand five hundred ($3,500) dollars upon cash loan of said sum, due one day from this date, which loan is at present secured by bill of sale," on the steamer French. Jacobs, in speaking of the bill of sale and the mortgage, says: "I told him [Henslee] he could own this boat [the French] and I would give him a mortgage on the other boat until this thing was adjusted." Henslee further desired such protection as insurance of the boat would give. Jacobs was unable to pay for it, but called at the agent's office in regard to the matter, as did also Berry and Henslee, but withdrew before the arrangement for insurance was consummated and never saw the policy. On or about October 17th a policy for $3,600 was issued directly to Henslee, without any loss-payable clause. In response to the insurance agent's inquiry as to the ownership of the vessel, Henslee said that the papers were in his name. He paid the premium in part in cash and gave his notes for the residue. On November 1st, by a letter signed by himself as "owner" and on November 11th, by a like communication signed in like manner, he notified a supply company and a coal company respectively to sell nothing more to the French except on cash payment, stating in one of such letters: "We are organizing a stock company and want all bills square." About November 1st he personally called on three of the boat's creditors,

stating to each, or a representative of each, that he was the owner of the boat, asked each for the sum due from it, and instructed two of them to sell nothing more to it except on his order. On November 14th the French burned to the water's edge and sank at the junction of the Tennessee and Sandy rivers, where the wreck still remains. On November 16th, two days after the loss of the vessel, his son, acting under his authorization, wrote four creditor concerns for a statement of the sums due each from the French. The certificate evidencing Jacobs' indebtedness to Henslee, dated July 25th, for the $3,500 advanced, was found at the trial in the possession of Jacobs, but when and how it got there is not clearly explained. Henslee realized nothing from his mortgage on the Alma, which was sold by the United States marshal. The insurance money to the extent of $3,248, being the sum named in the policy less certain agreed allowances, was paid to Henslee. Berry made no claim on the fund, but by common consent took the wreck at a valuation of $100, to be credited on his $400 claim against Jacobs. Claimants for supplies furnished, services rendered, and repairs made, liabilities the greater part of which arose after Henslee became the registered owner of the boat, libeled Henslee; all of the libels being in personam. Henslee by answer put in issue all of the claims. The actions, after consolidation, were referred to a "special master," who reported in favor of the demands of the libelants and found that Henslee was the owner of the French. The District Court overruled all exceptions to and affirmed the master's report, and held Henslee personally liable to the several libelants to the extent of their respective claims, with interest. Hence this appeal.

H. G. Hightower, of Cincinnati, Ohio, for appellant.

J. G. Wheeler, of Paducah, Ky., for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

SATER, District Judge (after stating the facts as above). [1] The correctness of the trial court's ruling depends on whether Henslee was the owner of, or a mere holder of a lien against, the steamer French. The crudely drawn instrument which Jacobs signed and delivered to Henslee, when the latter parted with his money, is the product of a young man, inexperienced and unskilled in the preparation of legal documents. It first certifies that there is due from Jacobs to Henslee $3,500, which is to be used solely to purchase the steamer. It then declares that the parties have agreed that Henslee shall own the boat until he is paid $1,500 in cash and given a note with approved security for the remaining $2,000. Jacobs did not have absolute control of the $3,500. His right and authority to expend or use it was restricted to the accomplishment of a single purpose—the purchase of the French. He was the instrumentality through which that vessel was to be bought. If he did not effect a purchase, he was, by necessary implication, to return the money to Henslee. If he purchased, Henslee instanter became the owner, and at the same time Jacobs' option to purchase sprang into existence. His liability to Henslee for the $3,500, which liability was akin to, if not precisely that of, an agent, would by the express and necessarily implied terms of the contract terminate when the steamer was bought, or, in case of failure from any cause to purchase it, when the money was redelivered to Henslee. Had the contract provided that Jacobs by the purchase should become the owner, then there would have been an absolute indebtedness from him to Henslee; but, as Henslee was at the time of the purchase to become the owner, there could

not be, after the purchase was made, an indebtedness to him from Jacobs, for the reason that Henslee's ownership and Jacobs' indebtedness could not coexist. It was within the contemplation of both that the boat could be bought for $3,500, and that through a corporation, whose forming Jacobs purposed, the $1,500 would be promptly paid, at which time a note with approved security was to be delivered. The ownership of the boat would then pass to Jacobs or his nominee. The intent to effect such an organization remained with Jacobs until the boat was destroyed, and was in Henslee's mind as late as November 11th, as evidenced by his letter of that date in which he characterized himself as "owner" of the boat.

At the time the contract was made, Henslee knew or learned of Jacobs' ownership of the Alma. It is not shown by a preponderance of the evidence that such ownership influenced Henslee in his dealings with Jacobs. If, however, he made inquiry as to the status of the Alma, he must have learned that it was incumbered by mortgage, which incumbrance, as disclosed by subsequent events, rendered worthless the subsequently acquired lien given on it. That Henslee, with his business experience, should permit the title to the boat to pass to Jacobs and should loan what was regarded as the full amount of the purchase price on property to be used in a business, with which property and business he was unfamiliar, and should accept no evidence of the creation of and of his right to a lien other than an unrecordable instrument, is improbable. It was more consistent with good business practice that he himself should take title to the property and become and remain its owner until Jacobs should acquire it by purchase. That such was his agreement is reinforced by his complaint, early expressed, about the bill of sale having been made to Jacobs, instead of himself. His solicitude for the consummation of the original proposed scheme, designed to relieve him of the ownership of the boat, and that it should not become indebted while his ownership continued, stimulated him to inquire as to the boat's business on substantially every trip it made. He knew it was losing money and that Jacobs was without means to meet its obligations. The situation was such as to spur him to action. He therefore took a bill of sale whereby he divested Jacobs of all indicia of title and lodged the same where it rightfully belonged —in himself. To secure the enrollment of the boat, he made oath that he was its sole owner and that Jacobs was its master, and consequently acting under the owner's authority. He inquired personally and by letter as to the boat's liabilities, informed certain of the creditors that he was its owner, directed some of them to furnish it nothing more except on his order, and, in his own name as owner, insured the vessel. His activities, which were such only as an owner would display, continued even after the boat's destruction, and can be reconciled only with an intention on his part to satisfy the claims against it. Not until some time after it had burned did he ever assert that Jacobs was its owner and himself a mere lienholder. The original agreement between them was at some time returned to Jacobs, and at no time did Henslee hold any instrument, negotiable or nonnegotiable, evidencing an indebtedness to himself from Jacobs. The logic of the situation required the return of the contract, because the purchase of the boat relieved

Jacobs of liability for the $3,500, and, on account of the option contained in it, he was entitled to its possession.

[2] We are not unmindful that the mortgage given on the Alma recites that it is to secure a debt from Jacobs to Henslee for a cash loan of $3,500 secured by a bill of sale on the steamer French. This is not necessarily inconsistent with Henslee's ownership of that vessel. The amount named in a mortgage is not conclusive as to the indebtedness, actual or contingent, that it secures. Jacobs had persuaded Henslee into an enterprise with the like of which the latter was unacquainted. If Jacobs should take over the boat, Henslee was justly entitled to compensation for the use of his money from July 25th until it should be returned to him, to the money paid for insurance, to protection against the boat's indebtedness and such expense as might reasonably be necessary for its care, maintenance, and disposition. If the option should not be exercised, and the boat be sold for less than enough to satisfy all accrued and accruing claims and expenses over and above the amounts necessary to make Henslee whole, he would necessarily sustain a loss. Whatever may be said as to whether there rested on Jacobs any legal obligation to Henslee, there was an unmistakable moral obligation to protect him against loss. That Jacobs was actuated by such a worthy motive appears from his expressed willingness that Henslee should own the French, and should, in addition thereto, have a mortgage on the Alma, until the arrangement originally made could be carried out. That Henslee understood the purpose of the mortgage to be such only as is above mentioned is evidenced by his subsequent acts and declarations of ownership, and his subsequent efforts to ascertain the boat's indebtedness in contemplation of its payment. Having regard to all the facts and circumstances disclosed, we are constrained to hold that he was the owner of the French from and after the date of its purchase by Jacobs through Berry at Wheeling, and that the master and the trial court reached the correct result.

[3] The libelants all proceeded against the owner in personam. This they were at liberty to do. Admiralty Rules 12 and 13 (29 Sup. Ct. xl); section 4, Act June 23, 1910, 36 Stat. 605 (Comp. St. 1916, § 7786). Limitation of Henslee's liability as owner of the vessel to the value of the wreck, under section 18, Act June 26, 1884 (23 Stat. 57, c. 121 [Comp. St. 1916, § 8028]), was abandoned in the course of the trial, and does not, therefore, require consideration.

This case, on account of its own peculiar facts, is easily differentiated from any mentioned in the briefs. A review of the cited cases is consequently deemed unnecessary.

The trial court is affirmed, and will make distribution of the insurance fund in accordance with the views above expressed.